Sondra W. HYMAN, et al., Plaintiffs,

v.

FIRST UNION CORP., et al., Defendants.

Civil Action No. 94–1043(RCL).

United States District Court,
District of Columbia.

Aug. 12, 1997.

Paul C. Sprenger, Sprenger & Lang, P.L.L.P., Minneapolis, MN, Jane Lang, Timothy B. Flemming, Michael D. Lieder, Sprenger & Lang, DC, P.L.L.C., Washington, DC, for Plaintiffs.

Francis C. Clark, Charlotte, NC, J. Thomas Kilpatrick, Christine M. MacIver, Atlanta, GA, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on the motion of plaintiffs to maintain their claims as class, collective, and consolidated actions and to designate issues for the common issue trial scheduled for October 6, 1997. Upon consideration of the written submissions, oral arguments, and the relevant law, the court will grant plaintiffs' motion to maintain both proposed collective actions under the ADEA. The court will rule separately on the remaining proposed classes.

### I. Background

In 1992 and 1993, defendant First Union[1] acquired three banking institutions in Virginia, Maryland, and Washington D.C. Two of

---

1. Plaintiffs have named First Union Corp., First Union National Bank of Virginia, First Union National Bank of Maryland, First Union National Bank of Washington, D.C., and First American Metro Corp., as defendants. The court will refer to defendants collectively as First Union.

the institutions employed the plaintiffs bringing this action: First American Metro Corp. and it subsidiary Mentor Savings, F.A. Plaintiffs allege that as a part of the acquisition process, First Union selected incumbents for termination that were disproportionately over 40 years old, black, and of foreign origin. Plaintiffs then aver that although First Union had promised the displaced employees "priority consideration" for other positions within the institution, First Union disregarded that promise and severed most of the displaced employees. Finally, plaintiffs allege that the employees hired to replace those laid off were almost exclusively under 40 and white.

Defendants, in contrast, characterize the events in 1992 and 1993 as a "benevolent incursion that rescued a failed institution." Def. Brief at 4. Because time was of the essence, many of First American's policies were quickly changed so the failing organization could be saved. While employees were displaced, there was no illegal discrimination, and certainly no pattern or practice of discrimination that was centrally instituted, according to defendants.

## II. Standard of Review

The evidence plaintiffs employ here for purposes of class and collective action certification is in large part the same evidence they will employ to prove the merits of their case at trial: evidence that First Union discriminated in its employment practices. The class and collective action certification inquiry, however, does not go to the merits of plaintiffs' case. Nor does this court have the authority to conduct a preliminary inquiry into the merits of plaintiffs' proposed case to determine if the proposed groups and classes should be certified. *Wagner v. Taylor*, 836 F.2d 578, 587 (D.C.Cir.1987). This court must then temper the intensity of its review of plaintiffs' evidence.

In reviewing the evidence underlying plaintiffs' claims, this court will only determine if that evidence establishes a reasonable basis for crediting plaintiffs' assertions.

That review will subject plaintiffs' evidence to a rigorous analysis but that analysis will not extend to the merits of plaintiffs' claims. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982).

Any more extended inquiry into plaintiffs' evidence is both unnecessary and ill-advised. First, a preliminary inquiry is sufficient to determine the propriety of certification. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Wagner*, 836 F.2d at 587. Second, an extended inquiry could have the effect of removing from the province of the jury those issues that an intensive review would necessarily resolve. *Eisen*, 417 U.S. at 178, 94 S.Ct. at 2152–53. The court sees no reason to venture so far into the thicket of proof presented here when any resulting findings would only leave the court stranded where it does not belong.

If plaintiffs supply sufficient evidence to provide a reasonable basis for concluding their classes satisfy Rule 23's requirements or that the members of the proposed collective actions are similarly situated, plaintiffs will have proven their proposed classes would promote efficiency and should be certified.

## III. Collective Action Group One: Terminated Exempt Line [2] Employees Alleging Age Discrimination under the ADEA

Plaintiffs have proposed that a collective action be maintained under the ADEA for all former exempt line employees of First American who were 40 or older when terminated (not for cause) by First Union between May 17, 1993 and June 30, 1994.

Congress enacted the ADEA to end discrimination in the workplace, *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978), by "promot[ing] employment of older persons based on their ability rather than age ... [and] prohibit[ing] arbitrary age discrimination in employment." 29 U.S.C. § 621(b) (1985). Discrimination be-

---

**2.** Line employees are those that work directly with customers and have a revenue and fee-generating orientation to their job responsibility.

cause of age is the only conduct proscribed by the ADEA. *See Elliott v. Group Medical & Surgical Service,* 714 F.2d 556, 567 (5th Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984).

The relief provisions of the ADEA are found in section 7(b) which states that the ADEA shall be enforced by the "powers, remedies and procedures" of the FLSA. 29 U.S.C. § 626(b). Specifically, the ADEA incorporates section 16 of the FLSA, 29 U.S.C. § 216(b) which states in pertinent part:

An action to recover the liability prescribed in [this Title] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

■ Thus to pursue a section 216(b) collective action, the claimants must be similarly situated. Plaintiffs argue that they have narrowed the proposed collective action so as to group together only similarly situated employees. First Union strongly disagrees.

There have been numerous cases that discuss under what circumstances a collective action in a termination case is appropriate. During oral arguments, plaintiffs identified ten factors that have been used by courts to evaluate proposed collective actions. While the court agrees with defendants that the inquiry cannot simply proceed as a checklist to see which party gets the most marks, the factors do provide an appropriate framework for the analysis.

The first set of factors involve an examination of the alleged activities of defendant. If there is evidence that the alleged discrimination was part of a institution wide practice, such evidence would support the use of a collective action. In support of certification, plaintiffs have outlined what they allege to be a centralized decision-making process that resulted in the discrimination. Acknowledging that individual managers did have discretion when deciding whom to retain,

plaintiffs argue that a few central individuals were responsible for the ultimate discrimination. Plaintiffs allege that high-level managers on First Union's due diligence team determined how many positions existed; top executives chose the leaders who decided which First American employees would fill the positions; defendant managers selected the sources of information about First American employees that would be available to the transition team leaders; the interviewers were centrally trained and given several pages of stock questions and a standardized form on which to evaluate interviewees; First Union executives set the timetable for interviews and placement decisions; First Union prepared information about the selection process for all First American employees; and First Union's Human Resources personnel reviewed all the decisions.

Although First Union characterizes this description of events as a "fable," the court finds that plaintiffs have presented evidence that provides a reasonable basis for crediting plaintiffs' assertion that the alleged discrimination was not a random occurrence but was carried out by several managers at the direction of management. Throughout its analysis, First Union ignores the significance of the fact that the terminations all resulted from two company-wide RIFs that occurred as a result of First Union's acquisition. In *Owens v. Bethlehem Mines Corp.,* 108 F.R.D. 207, (S.D.W.Va.1985), the existence of a single RIF was sufficient for the court to find that proposed members, who had lost their positions with six different divisions of the company, were similarly situated. *Id.* at 212. As in this case, the defendant employer had argued that there was no confluence in personnel decision-making between the divisions because the decision-makers reported to different departments. *Id.* at 210. Finding that a systematic reduction of the work force is a decision that is obviously made at a high level of the organization, the court in Owen concluded that the nature of the reduction of force made a broad class appropriate. 108 F.R.D. at 212.

Similarly, in the case before this court, there was a systematic reduction in the form of two RIFs that were directly tied to First

Union's takeover of First American. Furthermore, even though several different managers did have discretion in determining who was ultimately terminated, there is evidence that establishes a reasonable basis to credit plaintiffs' assertions that the allegedly discriminatory decisions were made because of a bias on the part of top management that filtered down to the decision-makers. For example, statements concerning experience being an obstacle and the desire for young employees have been attributed to David Carroll, the head of General Banking for First Union Virginia in 1993 and the person plaintiffs argue oversaw the process which determined the fate of First American employees. Depo. of Kinard at 274–77, Decl. of Livingstone. While single remarks cannot be the sole basis for a finding of discrimination, these remarks, together with the other evidence presented by plaintiffs, provide a reasonable basis to find that the alleged discrimination was the result of a company-wide practice.

The plaintiffs have also presented statistical evidence that they believe supports a finding of institution-wide discrimination. Defendants find many flaws in the statistical techniques, and provide their own analysis which would indicate that a pattern and practice of discrimination did not exist at First Union. Plaintiffs, in turn, find flaws with the statistical techniques used by defendants' expert. Statistical evidence, if both credible and probative, may be sufficient to support a claim for class certification. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989). Because of the other evidence which provides a basis for the decision to allow a collective action to proceed, the court will not review plaintiffs' expert's methodology at this time. An initial review of the evidence provided by First Union's expert illustrates a weakness that prevents the statistics from countering plaintiffs' other evidence. Defendants' expert analyzes the retention rate for each of the decision-makers and branches, and, based upon this rate and the number of First American employees over the age of 40, determines what she finds would be the expected number of retainees over the age of 40. In each situation, the expert concludes that

the actual number of retainees over the age of 40 is not significantly different from that which would be expected. Plaintiffs' argument is that the initial determination of how many to retain in a given area would have been influenced by the alleged discrimination, and the weakness in defendants' approach is that it fails to account for the initial determination of the retention rate. Thus, for purposes of class certification, defendants' statistics cannot counteract plaintiffs' other evidence of a pattern and practice.

The second group of factors evaluate the similarities of members of the proposed collective action. Weighing very strongly in favor of a collective action is the fact that the challenged employment practice, termination, is the same for each of the members. Additionally, the employees all come from a discrete geographical area limited to the two neighboring states of Maryland and Virginia and the D.C. area.

Throughout their brief, defendants wish to rely on the decision in *Lusardi v. Xerox Corporation*, 118 F.R.D. 351 (D.N.J.1987), to support a finding that the proposed members are in very different situations. In *Lusardi*, the district court used the disparate factual and employment settings of the individual plaintiffs to support a conclusion that the only similarities between the plaintiffs were the allegations concerning violations of the ADEA and their shared status as former or present Xerox employees. *Id.* at 359.

This case does not present the same situation. The class rejected in *Lusardi* was not restricted by time, location, or position. In *Lusardi*, the proposed plaintiffs analyzed from a sample group were employed in thirty-four cities or towns in sixteen different states. *Id.* at 357. As previously stated, the proposed members in this case are from Virginia, Maryland, and the District of Columbia. In *Lusardi*, the proposed plaintiffs' positions with Xerox ended during either one of twenty-eight voluntary RIFs or forty-seven involuntary RIFs that occurred over a four year period. All of the plaintiffs in this case were former employees of First American who were terminated during two RIFs in a span of six months that occurred after

First American was acquired by First Union. Finally, in *Lusardi* there was no attempt to limit the employment positions included in the collective action. While the plaintiffs from First American did not have identical positions with identical responsibilities, plaintiffs have not tried to include all former First American employees, but has limited the action to exempt line employees. Thus, the employees who are included in the group have similar job responsibilities.

The third group of factors involve the extent to which members of the proposed action will rely on common evidence to prove the alleged discrimination. The court concludes that these factors weigh heavily in favor of a collective action. In trying their case, each plaintiff will wish to use evidence that will demonstrate that the bias which led to the alleged discrimination came from top management and permeated the company. Additionally, each plaintiff will want to rely on statistical evidence to show that First Union terminated a disproportionate number of employees over the age of 40. Finally, each plaintiff will want to utilize evidence that younger replacements were hired after the termination of those over 40.

First Union argues that conflicts within the group necessitate a finding that the proposed group members are not similarly situated. For support, defendants cite this court's opinion *In re PEPCO Employment Litigation,* 1992 WL 442759 (D.D.C.). However, the situations presented by the two cases are markedly different, and the court rejects First Union's conflicts argument.

In *PEPCO*, the plaintiffs alleged that defendant PEPCO discriminated against both women and black employees. One proposed subclass under Rule 23 included all black exempt employees who alleged several types of discriminatory acts: compensation, advancement, discipline/termination claims, and a hostile work environment claim. *Id.* at *15. The conflicts arose because some of the plaintiffs alleged that fellow plaintiffs actually took part in the challenged discrimination by denying them promotions and raises. *Id.* at *22.

The alleged conflict in this case arises from the fact that some plaintiffs at one point supervised other plaintiffs in the action. Furthermore, these supervisor plaintiffs evaluated other plaintiffs at the request of First Union. First Union argues that these evaluations were used by First Union decision-makers when determining which First American employees to retain. At trial, First Union will wish to call some of the supervisory employees to have them testify why they ranked some of their fellow plaintiffs at the bottom of their associate group.

The existence of a supervisory relationship between class members has the ability to undermine a proposed class. *Wagner,* 836 F.2d 578, 595 (D.C.Cir.1987). In *PEPCO*, this court found that the supervisory relationships did undermine the class because some plaintiffs had claims of discrimination against other plaintiffs, and their supervisory role was of a continuing nature that would exist after the trial. Because that is not the situation in this case, the court concludes that no conflict exists which undermines that class. No plaintiffs are alleged to have discriminated against other plaintiffs. All of the termination decisions were reached by First Union employees. Plaintiffs have presented credible evidence that even if the evaluations had any impact on the termination decisions, it was a negligible impact. Furthermore, because all of the claims involve termination, there is no possibility of a continuing conflict.

Finally, First Union also argues that because of the different defenses available to First Union, the proposed group of plaintiffs are not similarly situated. In the ADEA context, an employer may defend an age discrimination case on the ground that the differentiation was based on "reasonable factors other than age." 29 U.S.C. § 623(f)(1). In response to a prima facie case based upon circumstantial evidence, an employer may contend that there has been no discrimination by simply "explain[ing] what he has done" or "produc[ing] evidence of legitimate nondiscriminatory reasons." *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978). First Union states that the litany of individual defenses it will rely on includes good cause, business necessity, and

waiver.[3] First Union asserts that it would be unjust to deny defendants, the opportunity to assert the variety of defenses applicable to individual plaintiffs.

The Existence of asserted separate defenses with respect to each plaintiff does not automatically eliminate § 16(b) joinder. *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 52 (3d Cir.1989). When there is the potential for problems with class management because of different defenses, a district court has the discretion to decide when such problems make class management impossible. *Id.* In *Lusardi*, the district court concluded that the proposed class was not manageable because there were 1325 plaintiffs, and the court questioned the fairness, manageability, meaningfulness of 1325 separate trials under the guise of a class action before a single jury. *Id.*

Again, this situation is far different from that in *Lusardi*, and the court concludes that the possible defenses do not make this class unmanageable. Although defendants identify several possible defenses, the facts presented by First Union lead the court to conclude that the main defense of defendants will focus on the business necessity of immediately revamping First American so that it could become a successful banking institution.

In determining that a collective action is appropriate, the court cannot consider the many factors in isolation, but must look at the entire picture as presented by both plaintiffs and defendants. It is clear to the court that the members of the proposed action have common claims and are commonly situated, and that the trial should proceed as a collective action.

## IV. Collective Action Group Two: Persons Desiring Employment with First Union Alleging Age Discrimination under the ADEA

■ Plaintiffs wish to maintain a second collective action consisting of all persons not employed by First Union who were 40 or older and, between March 15, 1993, and December 31, 1994, applied for, or expressed interest in, positions at First Union in First American's former regions but were not hired, and all such persons who were deterred from seeking such employment.

Unlike the termination group, the case law provides little guidance in determining when an applicant class is similarly situated. In fact, plaintiffs note only one case in which a collective action of applicants was considered, and then allowed pursuant to the ADEA. In *Pines v. State Farm General Insurance Co.*, 58 F.E.P. Cases 387 (C.D.Cal.1992), the district court found that the one named plaintiff had provided sufficient evidence to allow for an initial determination that she and other similarly-situated plaintiffs existed. In reaching this determination, the court relied on evidence that State Farm had engaged in a national policy of discrimination. The class was allowed to include all nationwide applicants for the position of trainee agent after either September 1, 1987 or January 1, 1988.[4] In allowing for the nationwide class which would cover four years, the court concluded that the facts did not present the manageability problems found by the court in *Lusardi*. *Id.* at 395.

The factors used to consider the propriety of a termination action are helpful in this situation as well. The first consideration is the existence of an institutional-wide policy of discrimination. Plaintiffs have provided substantial evidence that provides a reasonable basis to find the existence of a pattern and practice of age discrimination in the hiring of employees in the First American region.

First Union argues that because the hiring process was so decentralized, there is no possibility that a pattern and practice existed. In support of this, First Union points to the many ways that prospective employees could learn of positions at First Union. The

---

3. Plaintiffs exclude from the collective action those that they believe were terminated for good cause. Certainly, nothing will keep defendants from arguing that other members of the action were terminated for good cause.

4. The court concluded the two different dates were necessary because of states' adoptions of temporal restrictions of either 180 days or 300 days prior to the filing of the representative's EEOC filing.

positions could be advertised or recruited for through both internal and external sources. What First Union ignores is the central role of the Human Resources office in the filling of vacancies. When a manager had a vacant position that he wished to fill, the practice of First Union was that the manager would call the relevant contact in Human Resources. Depo. of Margaret A. Vitolo at 29. The manager and human resource contact would discuss the position, and then write up a job posting. *Id.* at 32, 34. After being contacted by applicants, and based on the contact's understanding of the job and the required skills, the human resource contact would identify the most qualified individuals for the position, and conduct pre-screening interviews. *Id.* at 34. The goal for the contact would be to pick the most qualified one or two applicants to send to the manager. *Id.* The manager would then conduct interviews and make a decision.

Thus, no matter how a prospective employee learned of a position available at First Union, the initial screening process was conducted by the Human Resources office, even if the manager had already identified the person he wished to have fill the position. As Ms. Vitolo stated, while a few "renegades" did not follow the process, all were supposed to have done so and a majority did. Additionally, the process was to be used for all positions from tellers to branch managers to high-level positions. Depo. of Anne Griffin Spartin at 112–114, Depo. of Vitolo at 32.

Plaintiffs also present evidence that the very process by which prospective applicants learned of positions at First Union was tainted by the alleged institutional bias. One researcher always commented in writing whether those she had contacted by telephone sounded young or old indicating that she thought First Union considered age as a hiring factor.

Finally, plaintiffs provide statistical evidence that compares First Union's hires to that of First American by job group. In each job group, First American hired a higher percentage of employees both over the age of 40 and over the age of 50. The disparity based on the age brackets is represented by 4.88 standard deviations. Defendants con-

test the value of the statistics because the numbers do not account for the applicant flow or the relevant workforce after First Union took over. Plaintiffs respond that this is the best evidence available because of the lack of data maintained about the age of applicants in the workforce. Even acknowledging the possible weaknesses in plaintiffs' statistics, the court concludes that they may raise an inference that further supports the evidence of a pattern and practice of age discrimination.

The next group of factors considers similarities of the proposed members of the collective action. The applicants all applied for positions in a discrete geographical area, in a short period of time limited to just one year and nine months. Thus, while they did not all apply for a single position as in Pines, these other factors support a finding that they are similarly situated. As the court in Pines noted, the members must only be similarly situated, not identically situated. *Pines*, 58 F.E.P. Cases at 395.

The third group of factors involves the use of similar evidence by the members of the class. Again, these factors weigh in favor of a collective action. Each plaintiff will wish to rely on evidence that the hiring process was centralized, and that the discrimination was a policy and practice instituted by top management and communicated to outside recruiters and researchers. Furthermore, each plaintiff will wish to use statistical evidence to show that First Union disproportionately hires younger applicants.

As with the first proposed collective action, defendants argue that the list of many possible defenses necessitates a finding that the plaintiffs are not similarly situated and that a collective action cannot proceed. Plaintiffs respond that most of the defenses are actually variations of one defense, business necessity, and that if defendants were right that the existence of different defenses necessarily prohibits the maintenance of a collective action, then no collective or class action on behalf of applicants could ever proceed. As previously stated, this court has the discretion to determine if the existence of several defenses makes an action unmanageable. Knowing that defendants must have the op-

portunity to present their defenses, the court concludes that the action is still manageable because of the similarities in the types of defenses that may be raised.

Finally, defendants argue that the proposed action is not sufficiently descriptive because of plaintiffs' desires to include those who were "deterred" from applying to First Union, and in any case, there are no representative plaintiffs who were deterred from applying. In an opinion issued separately today, the court gave plaintiffs leave to add plaintiff Michael Bunt to the hiring claims group. Bunt alleges that he expressed his interest in a position to a First Union employee, but was told that he was overqualified. Bunt believes that he was told to not apply because of his age. Additionally, the court did not give plaintiffs leave to add Paula Wein. Unlike Bunt, Wein never spoke to a single person from First Union, but was told by an employment agency that they would not be interested in hiring her. Because she did not state a claim against First Union, the court found that an amendment adding her name as a plaintiff with hiring claims would have been futile.

For these same reasons, the court agrees that the use of the word "deterred" is not sufficiently descriptive because it would include the claims of those like Wein who never spoke to First Union employees. However, the court does believe that those with claims similar to Bunt should be allowed to join the collective action. As a result, after the word "deterred" in the description, the phrase "by a First American employee" will be added. Finally, after the phrase "expressed interest," the phrase "to a First Union employee" will be added.

## V. Conclusion

For the reasons stated, the court approves, as modified, the two collective actions proposed by plaintiffs.

A separate order will issue today.

### ORDER

For the reasons stated in the accompanying opinion, it is hereby

ORDERED that plaintiffs' motion to maintain two collective actions under 29 U.S.C. § 216(b) is GRANTED, and it is further

ORDERED that the two collective actions shall include the following members and issues (and other factual and legal issues encompassed within the broad issues designated here):

#### Collective Action Members

(1) All former exempt line employees of the First American Bank group who were 40 or older when terminated (not for cause) by First Union between May 17, 1993 and June 30, 1994; and

(2) All persons not employed by First Union who were 40 or older and, between March 15, 1993 and December 31, 1994, applied for, or expressed interest to a First Union employee in, positions at First Union in First American's former regions but were not hired, and all such persons who were deterred by a First Union employee from seeking such positions.

#### Collective Action Issues

(1) Did First Union follow a pattern or practice of age discrimination in terminating First American exempt line employees, and if so, did it do so willfully?

(2) Did First Union follow a pattern or practice of age discrimination in hiring, and if so, did it do so willfully?