Arlene M. STONE, et al., Plaintiffs,

v.

FIRST UNION CORPORATION,
et al., Defendants.

No. 94–6932–CIV.

United States District Court,
S.D. Florida.

Sept. 4, 2001.

John Scarola, West Palm Beach, FL, Brenda Carter, Ft. Lauderdale, for plaintiffs.

Robert T. Kofman, Miami, FL, J. Thomas Kilpatrick, Atlanta, GA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DECERTIFY THE CLASS

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Decertify the Class [D.E. 699], filed on February 23, 2001. Plaintiff filed a Response [D.E. 736] on April 11, 2001, and Defendants filed a Reply [D.E. 767] on May 4, 2001. In addition, the parties filed supplemental memoranda [D.E. # s 828, 859, 861, 884, 885, and 928] addressing new developments in Eleventh Circuit case law.[1] Oral argument was held on August 9, 2001.[2]

The Complaint, originally filed on September 23, 1994, alleges age discrimination in violation of § 16(b) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 216(b) ("FLSA"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the age discrimination in employment provisions of Florida Statutes § 760.10. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, federal question jurisdiction.

The Court, having thoroughly reviewed the arguments of the parties, the relevant case law, and the record as a whole, and being otherwise advised on the premises, finds that Defendants' motion to decertify the class should be granted.

---

1. On May 29, 2001, the Eleventh Circuit addressed some of the ADEA class certification issues in *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208 (2001).

2. The parties agreed prior to oral argument on the motion to decertify that an evidentiary hearing with respect to this motion was not necessary. *See* Interim Order [D.E. 720], filed March 26, 2001.

## I. Background

Plaintiff Arlene M. Stone ("Stone") is a former employee of First Union National Bank of Florida ("FUNB") who seeks to represent a class of 160 individuals who are or were employed by FUNB, were at least 40 years old when employed by FUNB, and purportedly were demoted, involuntarily discharged, not rehired, laid-off, or otherwise suffered adverse employment actions due to their age between February 4, 1992 and June 30, 1994. Defendant First Union Corporation ("First Union" or "FTU") is a bank holding company headquartered in Charlotte, North Carolina. At all relevant times, FTU, through a wholly owned subsidiary known as First Union Corporation of Florida, owned the First Union National Bank of Florida ("FUNB"), a national bank with offices throughout the State of Florida.[3] FUNB was at all relevant times headquartered in Jacksonville, Florida.

During the period from February 1992 through June 30, 1994, FUNB acquired assets of nine banks that had failed during the savings and loan debacle of the late 1980s and early 1990s and that had subsequently been seized by federal regulators. Eight of these banks were controlled by the Resolution Trust Corporation ("RTC"),[4] and one was controlled by the Federal Deposit Insurance Corporation ("FDIC").[5] In two other instances, FUNB acquired institutions through actual mergers or business combinations without any government involvement.[6] Collectively, the Plaintiff and the 160 class members she seeks to represent were employed by eight of these eleven institutions prior to the FUNB acquisition.

Plaintiff contends that the First Union Defendants devised a scheme, in connection with the acquisitions of assets from failed banks in Florida, to discriminate against the older employees of these acquired institutions in favor of younger employees. Plaintiff contends that the closing of branch offices and operations centers, the failure to hire or the hiring only temporarily of the employees who staffed these offices, and the discharge of employees were motivated by discriminatory animus rather than compelling business considerations.

Plaintiff Stone, the representative Plaintiff in this action, was the manager of Southeast Bank of Florida's ("Southeast") Galt Ocean Mile branch office in Fort Lauderdale, Florida (Broward County), when FUNB acquired Southeast from the FDIC in the fall of 1991. At the time, Stone was 60 years old and had worked for Southeast and its predecessors since 1969.

After the merger, Stone was reassigned, with no reduction in compensation, to an assistant branch manager position in another Southeast branch. Stone was advised that the assistant branch manager position would be eliminated in Broward County as of the October 1992 conversion date and that her job would therefore end at that time. Stone subsequently posted for other positions, but was not hired for them. In October 1992, Stone's position was eliminated, and her employment was terminated.

Thereafter, on November 30, 1992, Stone filed a charge of age discrimination with the EEOC. In a Determination letter dated June 10, 1994, the EEOC dismissed the charge, finding a lack of credible evidence to support the allegations. Plaintiff filed her Complaint in the United States District Court for the Southern District of Florida, alleging age

---

**3.** Through a series of mergers and name changes in 1997, First Union National Bank of Florida became part of a single consolidated national bank known as First Union National Bank, which is a direct subsidiary of FTU. The acronym FUNB is used in this order to refer to the now defunct First Union National Bank of Florida.

**4.** The eight institutions controlled by the RTC prior to FUNB's acquisition of their assets and liabilities were Florida Federal Savings Bank, American Pioneer, Professional Federal Savings Bank, Security First Federal Savings & Loan

Association, Flagler Federal Savings & Loan Association, Jacksonville Federal Savings & Loan Association, Citizens Federal Savings & Loan Association, and Gold Coast Federal Savings Bank.

**5.** The institution controlled by the FDIC was Southeast Bank.

**6.** The acquired institutions not under the control of a government entity were Meritor Savings, FA and The Enterprise Bank, N.A.

discrimination in violation of the ADEA and Florida law, on September 23, 1994.[7]

## II. Discussion

The ADEA prohibits age discrimination in employment. 29 U.S.C. § 623; *see Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 167, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Class actions under the ADEA are authorized by 29 U.S.C. § 626(b),[8] which expressly borrows the opt-in class action mechanism of § 216(b) of the FLSA, instead of the opt-out class procedure provided in Fed. R.Civ.P. 23. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir.2001). Under § 216(b), putative plaintiffs must affirmatively opt into the class action by filing a written consent with the court in order to be considered a class member and be bound by the outcome of the action. *Id.; Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996). To maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are "similarly situated." 29 U.S.C. § 216(b).[9]

▮ Furthermore, the Eleventh Circuit has adopted the piggybacking rule in ADEA cases. *See Hipp*, 252 F.3d at 1217; *Grayson*, 79 F.3d at 1101. Normally, an employee who wishes to sue his or her employer for age discrimination must first file an administrative charge of discrimination with the EEOC. However, under the piggybacking or first-filed rule, a putative plaintiff may piggyback his claim onto the claim of a plaintiff who has filed a timely charge. *Id.* In order for a plaintiff to piggyback on another plaintiff's charge, (1) the relied upon charge to which he or she is piggybacking must be valid, (2) the individual claims of the named filing plaintiff and the piggybacking plaintiff must arise out of similar discriminatory treatment occurring in the same time frame, and (3) the operative charge must give adequate notice of class-wide discrimination. *Id.*

The Eleventh Circuit's recent decision in *Hipp* endorsed a two-tiered ADEA class certification approach, in which the court makes a preliminary, conditional certification at the notice stage of the case using a fairly lenient standard, and a second, more rigorous factual determination on the similarly situated question after a motion for decertification by the defendant. *See Hipp*, 252 F.3d at 1219. That is the procedure that was followed in this case. Therefore, based on the guidance recently provided by the Eleventh Circuit on this issue, this order reexamines the decision to preliminarily certify the class using the

7. Defendants sought summary judgment on Plaintiff Stone's individual claims, arguing that Stone's action was untimely and is barred by the statute of limitations established under the ADEA. The Court found by prior order that there are genuine issues of material fact that preclude the granting of summary judgment on this issue. *See* Order Denying Defendants' Motion for Summary Judgment With Regard To Plaintiff Arlene Stone's Claims [D.E. 812], filed May 24, 2001.

8. 29 U.S.C. § 626(b) states:

The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section. Any act prohibited under section 623 of this title shall be deemed to be a prohibited act under section 215 of this title. Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have juris-

diction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section. Before instituting any action under this section, the Equal Employment Opportunity Commission shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion.

9. 29 U.S.C. § 216(b) states in pertinent part:

An action ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

piggybacking rule and the temporal scope of the class that was preliminarily certified, and analyzes the propriety of issuing final certification of a class of similarly situated ADEA plaintiffs for trial purposes.

## A. The Preliminary Certification

At the end of 1998, the Court approved the sending of notice of the action to potential class members who: (a) are or were employed by First Union National Bank of Florida ("FUNB"), (b) were at least forty years of age while employed by FUNB, and (c) were demoted, or involuntarily discharged, or not rehired, or laid-off, or otherwise suffered adverse employment actions between February 4, 1992 through June 30, 1994 because they were over the age of forty. *See* Oct. 8, 1998 Order on Appeal of Magistrate's Order, D.E. 127; Order on Motions to Amend and to Reconsider, D.E. 135; and Plaintiff's Notice of Submission of Second Amended "Notice of Right to Opt–In", D.E. 141. In the October 8, 1998 Order, the Court found that Plaintiff Stone's charge provided adequate notice of class claims, and that it could therefore properly serve as the representative charge. Specifically, the Court stated:

> While the [EEOC] charge and [Plaintiff Stone's accompanying] affidavit fall short of a direct allegation of class-wide discrimination, they do provide notice that individuals other than Plaintiff were affected by Defendants' actions, and that such wrongful probations and firings were not happening to "younger people." Evidently, EEOC and First Union National Bank treated Plaintiff's charge as more than an isolated incident in that the Bank denied any pattern or practice of age discrimination, and the EEOC considered the matter beyond Plaintiff's charge. No doubt this was because the First Union defendants were already under scrutiny due to other allegations of age discrimination during the same time period. It was clearly foreseeable to both the EEOC and the Defendants that the alleged unlawful practices affected others along with Plaintiff, and there is no reason to believe that the Defendants would have reacted differently or the EEOC would have had a better opportunity to conciliate had Plaintiff's charge included more direct statements of class-wide discrimination.

October 8, 1998 Order on Appeal of Magistrate's Order, D.E. 127, p. 5–6 (footnotes and citations omitted). Based on the Eleventh Circuit's recent decision in *Hipp*, the Defendants have sought to have the Court revisit the preliminary certification decision and redefine the scope of the class.

### 1. Supporting Charge

■ Defendants argue that Stone's charge cannot support the class action because it fails to provide sufficient notice of class claims.[10] In particular, Defendants argue that the Court should revisit its earlier findings in light of the Eleventh Circuit's statement in *Hipp* that "[Plaintiff] Hipp's charge did not put the EEOC and [Defendant] Liberty National on notice of the collective nature of the claims, so it cannot serve as the representative charge." *Hipp*, 252 F.3d at 1225 n. 19. Plaintiff Hipp had alleged in his charge that, "As a result of management's desire to have younger management, I was subjected to continuous harassment and felt forced to resign." *Id.* at 1233 n. 37. The parties in *Hipp* agreed that Plaintiff Stein filed the representative charge in the *Hipp* case, and the Eleventh Circuit accepted his charge as such. *Id.* at 1217 & 1225. Plaintiff Stein's charge alleged, "I believe [the defendants] have violated my rights, as well as the rights of both older workers and applicants. ... [The defendants] have implemented a uniform practice and policy of age discrimination by forcing older employees to retire, take demotions, terminating them, and/or subjecting them to continued harassment, abuse, and discriminatory policies and practices.... I file these charges on behalf of myself and all others similarly situated." *Id.* at 1242 n. 64.

10. Stone's EEOC charge and accompanying affidavit include the following statements: "[Y]ounger people have not been subjected to the type of treatment I received;" First Union was "setting me up so that they could fire me;" and "They had done this to other employees—placing them on probation and then firing them [for unfounded reasons]."

It is clear that in order to serve as the basis for an ADEA class action, the underlying EEOC charge must give adequate notice of the scope of the class. *See Hipp*, 252 F.3d at 1224–25; *Grayson*, 79 F.3d at 1104–05. It is required that there "be some indication that the grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim," and the charge must alert the EEOC that "more is alleged than an isolated act of discrimination." *Grayson*, 79 F.3d at 1107. The individual charge-filing requirement is designed to put the EEOC and the employer on notice of the allegations. Consistent with this purpose, the piggybacking rule is designed to allow non-filing plaintiffs to rely on the charges of filing plaintiffs when it would be a useless act for the non-filing plaintiffs to file their own charges. *Hipp*, 252 F.3d at 1225.

Defendants are correct that the allegations in the charge and affidavit filed by Plaintiff Stone ("younger people have not been subjected to the type of treatment I received;" First Union "had done this to other employees") are not appreciably different from the allegations set forth by Hipp ("As a result of management's desire to have younger management, I was subjected to continuous harassment . . ."), which the Eleventh Circuit stated did not put the EEOC and defendant on notice of class-wide discrimination. However, as this Court noted in the October 8, 1998 Order, the particular facts of this case made it foreseeable to the EEOC and Defendants that the alleged acts of discrimination affected many employees in addition to Stone. *See* October 8, 1998 Order, D.E. 127, p. 6 n. 5 (noting that both before and after Plaintiff's November 30, 1992 charge, other charges of age discrimination were filed against First Union National Bank and that the EEOC and First Union National Bank had ample notice to conciliate). Indeed, both the EEOC and First Union National Bank treated Stone's charge as more than an isolated incident. *See id.* at p. 5–6 (finding that First Union National Bank denied any pattern or practice of age discrimination, and the EEOC considered the matter beyond Plaintiff's charge). Accordingly, based on the particular facts of this case, there is no reason to disturb the previous holding that Plaintiff Stone's charge provided sufficient notice of the class-wide nature of the claims and may adequately serve as the representative charge.

### 2. Temporal Scope

Next, Defendants argue that the *Hipp* decision clarified the temporal scope of the appropriate opt-in class, such that it is necessary for the Court to adjust the forward scope of the opt-in class established by the Court's October 8, 1998 and December 2, 1998 Orders from June 30, 1994, when the EEOC issued a determination and right to sue letter with respect to Stone's charge, to November 30, 1992, the date Stone filed her charge with the EEOC.[11]

---

11. The October 8, 1998 and December 2, 1998 Orders established an adverse employment action time period of February 4, 1992 through June 30, 1994. It is undisputed that Plaintiff Stone's claim was filed with the EEOC on November 30, 1992, and that the EEOC issued a determination and right to sue letter in June 1994. Neither party takes issue with the rearward temporal opt-in date (February 4, 1992, which is 300 days prior to the date Stone filed her charge), agreeing that the rearward date conforms with the requirements of *Hipp. See Hipp*, 252 F.3d at 1220 (holding that the rearward scope of an ADEA opt-in action should be limited to those plaintiffs who allege discriminatory treatment within 180 days (or 300 days in a deferral state, such as Florida) before the representative charge is filed).

The Court notes that Plaintiffs have also argued, in their supplemental memoranda, that the Court should consider the EEOC charge of Patricia Crowley for purposes of determining the applicable forward scope. Ms. Crowley filed an EEOC charge on August 16, 1993. Crowley, however, has never been a named plaintiff in this action, and Plaintiffs have not made any motions to add Crowley as a representative plaintiff. Moreover, even if Crowley's charge is considered and it is assumed that it was valid and sufficient to put the EEOC and FUNB on notice that she alleged class-wide age discrimination, the Eleventh Circuit has stated that the appropriate representative charge for purposes of establishing the applicable opt-in dates is "the first timely filed charge of one of the named plaintiffs that gives adequate notice of the scope of the class." *Grayson*, 79 F.3d at 1104–05. It has already been established that the Stone charge was sufficient to put the EEOC and FUNB on notice of the class-wide charges, and it is undisputed that Stone's EEOC charge was filed prior to Crowley's charge. It is therefore unnecessary and

■ In *Hipp,* the Eleventh Circuit adopted the general rule that "the forward scope of an opt-in class ends on the date the representative charge is filed [with the EEOC]." *Hipp,* 252 F.3d at 1225. The Court stated that the filing of the representative charge puts the EEOC and the employer on notice of the class-wide allegations of discrimination, and permits non-filing plaintiffs for whom the filing of their own charges would be a "useless act" to piggyback into the case. *Id.* Since it would not be "useless" for plaintiffs with claims arising after the representative charge is filed to file their own charges, those parties may not opt into the case. *Id.* Requiring plaintiffs with claims arising after the representative charge is filed to file their own claims serves the purpose of notifying employers and the EEOC of the allegations in a timely manner. *Id.*

The Eleventh Circuit recognized, although it did not find reason to apply, a limited exception in cases "[w]here the representative charge clearly alleges a continuing, concrete policy that is illegal, as in *McDonald [v. United Air Lines, Inc.,* 587 F.2d 357 (7th Cir.1978) ]," such that "it might be fair to assume the company has knowledge of later-arising claims challenging the same policy." *Hipp,* 252 F.3d at 1226. In a footnote, the Court explained:

> In *McDonald,* the defendant, United, had an explicit discriminatory policy: a no marriage rule for flight attendants. It was certainly reasonable to expect United to be on notice, from the filing of the first charge, that it could expect flight attendants to continue challenging the policy until the policy was withdrawn.
>
> \*   \*   \*   \*   \*   \*
>
> We recognize that in such cases the line between the "similar discriminatory treatment" and "in the same time frame" requirements becomes somewhat blurred. When plaintiffs so clearly meet the "similar discriminatory treatment" requirement, as in *McDonald,* courts can afford to be somewhat more lenient with respect to the "in the same time frame" requirement,

without sacrificing fairness to the employer.

*Id.* at 1226 n. 22. *McDonald* represents an example of a case in which it would be a "useless act" for plaintiffs whose claims arise after the representative charge was filed to file a claim because the representative charge clearly put the EEOC and the employer on notice that the plaintiffs were likely to assert claims. *Id.*

■ Plaintiff in this case concedes that Stone's EEOC charge does not meet the standard of placing the EEOC and the Defendants on notice of a continuing, concrete pattern and policy of illegal discrimination. *See* August 9, 2001 Transcript, p. 41. However, Plaintiff argues that the Court should look beyond Stone's charge to other charges in order to find that the circumstances of this case are such that the notice requirements and conciliation opportunity purposes that are the foundation of the piggybacking policy have been served.

To be sure, this Court has already found above and in the October 8, 1998 Order that the other charges filed against First Union were sufficient, in the context of this case, to put the EEOC and First Union on notice that Plaintiff's Stone's claim was class-based. The operative question, for purpose of extending the forward scope of the opt-in class beyond the date of the filing of the representative charge, is whether the EEOC and the employer were clearly put on notice that the alleged violation was continuing. *See Hipp,* 252 F.3d at 1225 n. 20. In this case, the several similar charges of age discrimination related to FUNB's take-over practices filed with the EEOC both before and after Plaintiff Stone's charge provide adequate notice that the violations were continuing and ongoing. The limited exception recognized in *Hipp* applies, in that, like *McDonald,* the EEOC and the employer had, "knowledge of later-arising claims challenging the same policy." Under such circumstances, it was appropriate to extend the opt-in date until the EEOC had completed its attempts to conciliate with FUNB and issued a determination and right to sue letter to Plaintiff. Accordingly, the forward opt-in cut-off date previ-

inappropriate for the Court to consider Crowley's     charge in this analysis.

ously set by the Court of June 30, 1994, will not be disturbed.

### B. The "Similarly Situated" Requirement

#### 1. The Applicable Standard

Before considering the propriety of issuing final class certification in this case, it is necessary to set forth the standard to be applied in the Eleventh Circuit concerning "similarly situated" class plaintiffs under 29 U.S.C. § 216(b). In this regard, the two most significant cases are *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir.2001), and *Grayson v. K Mart Corp.*, 79 F.3d 1086 (11th Cir.1996).

In *Grayson*, the Eleventh Circuit affirmed a District Judge's decision to permit the plaintiffs to allege an ADEA class action under 29 U.S.C. § 216(b) and to send notice to potential opt-in class members. The plaintiff class consisted of store managers within K Mart's Southern Region [12] who had either been terminated or demoted during a two-year time period. *Grayson*, 79 F.3d at 1090. The *Grayson* Court found that the initial class certification was appropriate, "because the plaintiffs have made substantial allegations and provided evidentiary support for their contention that they were victims of an age-motivated purge in K Mart's Southern Region from 1990 to 1992." *Id.* at 1097. As support for this holding, the Circuit Court relied on testimony from plaintiffs' statistical expert, statements by high-level decision makers within K Mart, and evidence of K Mart's discriminatory practices and policies. *Id.* at 1097–99.

In *Hipp*, the Eleventh Circuit found that the District Court did not abuse its discretion in certifying an ADEA opt-in class under § 216(b), despite the fact that the District Court failed to utilize the two-tiered approach to certification that the *Hipp* Court endorsed. The *Hipp* Court relied heavily on *Grayson* to uphold certification of a class consisting of ten plaintiffs, who, despite working in different geographical locations, all held the same job title and all alleged similar, though not identical, discriminatory treatment. *See Hipp*, 252 F.3d at 1219.

Both *Grayson* and *Hipp* hold that the "similarly situated" requirement is **more elastic and less stringent** than the requirements found in Fed.R.Civ.P. 20 [13] (joinder) and Fed.R.Civ.P. 42 [14] (severance). *Grayson*, 79 F.3d at 1096; *Hipp*, 252 F.3d at 1219. While setting forth the rule, neither *Grayson* nor *Hipp* take the next step of establishing **how much less stringent** the requirements are in practice, and what this means in terms of application of the criteria. In the absence of direct guidance, it is necessary to consider the approach used in each case and to compare that approach to the facts of this case.

Because "similarly situated" is more elastic than Rule 20 and Rule 42, it is first necessary to understand what these rules require and then determine what a "more elastic and less stringent approach" would involve. A

---

**12.** K Mart's Southern Region covered approximately 700 stores in eighteen states, Puerto Rico, and the Virgin Islands.

**13.** Fed.R.Civ.P. 20 provides:
All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.... A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

**14.** Fed.R.Civ.P. 42 provides:

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.
(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

party seeking joinder of claimants under Rule 20 must establish two prerequisites: (1) a right to relief arising out of the **same transaction or occurrence**, or series of transactions or occurrences, and (2) some question of law or fact common to **all** persons seeking to be joined. *Alexander v. Fulton County*, 207 F.3d 1303, 1323 (11th Cir.2000). As noted in *Alexander*, the central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits. *Id.* At the same time, the Federal Rules of Civil Procedure also recognize countervailing considerations to judicial economy, such as where the efficiency of a consolidated trial is outweighed by its potential prejudice to the litigants. *Id.* (citing Rule 42(b) as an example).

In determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts treat the term transaction flexibly. *Alexander*, 207 F.3d at 1323. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connections as upon their logical relationships. *Id.* By implication, "similarly situated," being a more elastic standard, may be satisfied even if the common nexus is not derived from the **same** transactions or occurrences, but the allegations and threshold proofs of "pattern or practice" discrimination are based upon **different** transactions or occurrences which are logically connected.

The second prong of Rule 20 does not require that all questions of law and fact raised by the dispute be common, but only that some question of law or fact be common to all parties. *Id; see also Grayson*, 79 F.3d at 1095–96 (suggesting that "a united policy, plan, or scheme of discrimination" can satisfy Rule 20's commonality requirement). If the "similarly situated" standard is more flexible, it necessarily follows that some common questions of law or fact, but not all, must be shared among the putative plaintiffs with the named plaintiffs in the collective action. By implication, while a "unified policy, plan, or scheme of discrimination" can satisfy the "similarly situated" threshold if sufficiently pled and established, its absence alone does

not mean that the criteria cannot otherwise be established by other means. Nonetheless, it is a factor for consideration.

Accordingly, that the plaintiffs are "similarly situated" may be established even if the transactions or occurrences are **not identical**. *Grayson* so holds when it quotes *Sperling v. Hoffmann–La Roche* for the proposition that, "[P]laintiffs need show only 'that their positions are similar, not identical,' to the positions held by the putative class members." *Grayson*, 79 F.3d at 1096 (*quoting Sperling v. Hoffman–La Roche*, 118 F.R.D. 392, 407 (D.N.J.1988), *aff'd in part and appeal dismissed in part*, 862 F.2d 439 (3rd Cir.1988), *aff'd, Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)). Moreover, by implication, not **all** questions of law or fact must be common; rather, it is enough if **some** questions of law or fact are common to all parties, even if such questions do not predominate. *See Grayson*, 79 F.3d at 1096 (*quoting Flavel v. Svedala Indus. Inc.*, 875 F.Supp. 550, 553, which states, "The 'similarly situated' requirement, in turn, is considerably less stringent than the requirement of [Rule 23(b)(3) ] that common questions 'predominate,' or presumably, the Rule 20(a) requirement that claims 'arise out of the same action or occurrence.' ").

Defendants have adhered to the position that the term "similarly situated," as incorporated into the ADEA, is defined by the class action standards under Fed. R.Civ.P. 23. In support of this argument, Defendants rely on language in *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989), stating that federal courts have the power to manage the joinder of parties in an ADEA action in a manner that is orderly, sensible, and does not conflict with the federal rules, and the Eleventh Circuit's opinion in *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir.1998) (*en banc*), which applied Rule 23 principles to hold that the ADEA limitations period is tolled during the pendency of an ADEA class action. While aspects of Defendants' proposed Rule 23 analysis are compelling, *Grayson* nonetheless has made it clear that the requirements for

satisfying Rule 23 are considerably more involved than the unitary similarly situated requirements of § 216(b). In *Grayson*, the Circuit Court stated, at 79 F.3d at 1096 n. 12, "Although not at issue in this case, it is clear that the requirements for pursuing a § 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23." Later in *Grayson*, the Circuit Court again explained that, "[i]n creating a collective action procedure for ADEA actions, Congress clearly adopted the opt-in joinder procedure of § 216(b) of the FLSA and thus impliedly rejected the Rule 23 class action procedures applicable to Title VII actions." *Grayson*, 79 F.3d at 1106.

The Eleventh Circuit's viewpoint in *Grayson* is not limited to the difference between "opt-in" versus "opt-out" procedures, but addresses, as well, the underlying criteria as to when an ADEA collective action versus a Rule 23 class action is permitted. The Court concurs with the Plaintiffs that the Rule 23 standard is inapplicable with regard to whether a § 216(b) collective action should be permitted, and that the applicable standard is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance). Given the clear holdings on this issue set forth in *Grayson* and *Hipp*, it does not logically follow, as Defendants' suggest, that a **more stringent** standard (*i.e.*, Rule 23) should apply when the Rules 20 and 42 criteria, being less stringent, do not.

*Hipp* cited *Grayson* with approval on this point [as well as *LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 288–89 (5th Cir. 1975) (recognizing the "fundamental" difference between Rule 23 class actions and § 216(b) class actions)]. *Hipp*, 252 F.3d at 1216. The Eleventh Circuit clearly stated that, "[t]his Court expressed its view of the similarly situated standard in *Grayson*." *Hipp*, 252 F.3d at 1219. Furthermore, *Hipp* reconfirmed that, "a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal "similarly situated" requirement of § 216(b)," and that, "plaintiffs bear the burden of demonstrating a reasonable basis for their claim of class-wide discrimination." *Id.* (*quoting Grayson*,

79 F.3d at 1095). The plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary. *Hipp*, 252 F.3d at 1219 (*citing Grayson*, 79 F.3d at 1097).

In determining whether plaintiffs have met their burden, both the *Grayson* and *Hipp* Courts refer to non-conclusive factors which may be considered by the district judge to measure the nature and degree to which the plaintiffs are "similarly situated" and to evaluate whether the plaintiffs have sufficiently pled and demonstrated a reasonable basis for their claim of class-wide age discrimination. Application of these factors must be considered in the context that, "Congress has stated its policy that ADEA plaintiffs should have the opportunity to proceed collectively." *Grayson*, 79 F.3d at 1096 (*citing Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989)). As noted in *Hoffmann–La Roche*, "[a] collective action allows age discrimination plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Hoffmann–La Roche*, 493 U.S. at 170, 110 S.Ct. at 486.

At a minimum, Plaintiffs must show that they each sustained some adverse employment action following FUNB's take-over of the financial institution that employed them, and that each was age forty and older when it occurred. But that is not the extent of the inquiry; that is, mere proof of this general conclusion does not alone carry Plaintiffs' burden. In addition, Plaintiff Stone must show that her position is similar, not identical, to the positions held by the putative class members. *Grayson*, 79 F.3d at 1096.

The factors enunciated in *Grayson* and *Hipp* to assist in this analysis include: (1) whether the plaintiffs all held the same job titles (applicable in both *Grayson*, 79 F.3d at 1090, and *Hipp*, 252 F.3d at 1219); (2) whether the plaintiffs worked in different geographical locations (a factor held to be

"nonconclusive" in *Hipp*, 252 F.3d at 1219); (3) the extent to which the claimed discrimination occurred during different time periods and by different decision makers (*cf., Alexander*, 207 F.3d at 1324); (4) whether plaintiffs have provided "statistically significant" evidence of age discrimination (*Grayson*, 79 F.3d at 1097);[15] (5) whether the Plaintiffs all alleged similar, though not identical, discriminatory treatment (*Hipp*, 252 F.3d at 1219); (6) whether the plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that Defendant's decision makers have articulated and manifested a clear intent to purge the Defendant of older employees (*Grayson*, 79 F.3d at 1097–99); and (7) whether the Defendant took steps to implement its plan, such as by targeting older employees for criticism and building a "paper trail" that would be grounds for their demotion (*Id.*). Obviously, each case must be reviewed on its pertinent facts to determine whether these, or other factors, are relevant to measure the nature and degree of "similarity."

District courts in other jurisdictions that have addressed the meaning of "similarly situated" have used a multi-factor, ad-hoc analysis to assist them in determining whether to authorize an action. For example, the district court in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J.1987), *mandamus granted, appeal dismissed by Lusardi v. Lechner*, 855 F.2d 1062 (3rd Cir.1988), found the following factors to be instructive: (1) the plaintiffs' factual and employment settings; (2) the individual defenses that the defendant may assert against each plaintiff; (3) fairness and procedural considerations; and (4) the presence of filings required by the ADEA. *See also Bayles v. American Med. Response of Colorado, Inc.*, 950 F.Supp. 1053, 1066 (D.Col.1996); *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D.Col.1997); *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 568 (N.D.Ala.1995). In *Hyman v. First Union Corp.*, 982 F.Supp. 1 (D.D.C. 1997), the district court found three sets of factors helpful to its analysis: (1) the alleged activities of the defendant; (2) the similari-

ties among the members of the proposed collective action; and (3) the extent to which members of the proposed action will rely on common evidence to prove the alleged discrimination. *Hyman*, 982 F.Supp. at 1–5; *see also Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 482 (E.D.N.Y.2001).

### 2. Application to This Case

■■■ Upon review, the Court finds that maintenance of an ADEA collective action involving Plaintiff Stone and all 160 opt-in plaintiffs is inappropriate under the facts of this case. The proposed opt-in class mixes employees with different job titles and from all levels of the organization; includes individuals employed within different divisions of the bank; includes individuals who assert a variety of claims, many of which have not been asserted by the representative Plaintiff; and fails to provide evidence of the application of an overriding discriminatory policy, practice, or procedure. Taken as a whole, the factors set forth above and described in greater detail below weigh heavily in favor of decertifying the subject class.

#### i. Types and Numbers of Acquisitions at Issue

Plaintiff Stone and the 160 opt-in Plaintiffs involved in this case were employed by banking institutions acquired by First Union in at least eight different mergers and acquisitions that occurred throughout Florida during several years. These transactions varied in a number of significant ways. Most of these transactions were asset and liability acquisitions, rather than mergers. *See* Newberg Aff., ¶ 6. In the case of acquisitions from the FDIC or RTC, there were significant variations in the government entity or entities involved, the terms of the acquisition agreements, the degree of the government's active involvement in the transition of the acquired assets into FUNB, and in FUNB's role vis-à-vis other acquiring institutions. *Id.* at ¶ 7. For example, FUNB was sometimes the sole acquirer of an insolvent institution. When it was not the sole acquirer, FUNB sometimes

---

**15.** While such evidence is not required by Plaintiffs to meet their burden, its absence is a factor that may be considered, along with other factors.

assumed the role of "lead acquirer." As such, FUNB stepped in to temporarily run the institution and assumed responsibility for many back office functions that benefitted all acquirers through the conversion date. *Id.* As each other acquirer completed its conversion process, that acquirer took over the various back office responsibilities for its own assets and liabilities, thus reducing the amount of work FUNB was required to perform and decreasing its staffing needs. *Id.*

Furthermore, the different types of transactions went through different stages and processes. In instances where a failed institution's assets and/or liabilities were acquired from the government, the process started with a "due diligence" analysis of the potential acquisition by FUNB based on records made available by the government. Newberg Aff., ¶ 9. There followed a bidding and negotiation period. When FUNB's terms were accepted, an agreement was executed, and all necessary regulatory approvals were immediately put into place. *Id.* In what was often called a "resolution weekend," the government and FUNB worked together to begin balancing institutional accounts and apportioning assets. FUNB also began making some of the systems conversions to open the bank on the following Monday morning, when FUNB would take over the day-to-day operation of the institution. The conversion process continued for several weeks up to a year, depending on the size of the merger. *Id.* For acquisitions that did not involve the government, the process involved due diligence, bidding and/or negotiations, and the execution of the relevant agreements. Newberg Aff., ¶ 11. Regulatory approval usually took several months, after which FUNB had a year to complete the transaction. At a later date, systems were converted and the acquired institution began to operate under the FUNB name, direction, and management. *Id.*

Plaintiff has not presented the Court with any cases that have upheld a collective action that involved this degree of diversity in the number or type of transactions out of which

the alleged discriminatory practice grew. *Grayson*, for example, stemmed from the implementation of a new policy, termed the "Renewal Program," that was targeted towards replacing older managers with younger managers in K Mart's Southern Region, and that was instituted in 1987 when Joseph Antonini became President, CEO, and Chairman of K Mart. *Grayson*, 79 F.3d at 1091. Even the *Hyman* case, upon which Plaintiffs rely heavily in their arguments, concerned only two reductions in force ("RIF") that were directly tied to the defendant's takeover of a single banking institution. *See Hyman v. First Union Corp.*, 982 F.Supp. 1, 3–4 (D.D.C.1997). Accordingly, the Court finds that the number of acquisitions and mergers upon which the claims are based and the variations in the implementation of those transactions weighs in favor of decertifying the class.

### ii. Job Titles

As noted above, Plaintiff Stone was a branch manager for Southeast at the time FUNB acquired Southeast. From the outset of the acquisition, Stone was reassigned to an assistant branch manager position in another Southeast branch, and one year later, at the conversion date, her employment was terminated. Both the branch manager and assistant branch manager positions are considered exempt positions under the FLSA.

The class of Stone and 160 opt-in Plaintiffs mixes exempt high level managers, mid-managers, and first line supervisors with nonexempt clerical, technical, and administrative employees. *See* Defs. Exhibit D. Only fourteen class members,[16] in addition to Stone, were branch managers at the time their institution was acquired or merged with FUNB. *See* Defs. Motion, p. 24 and Exh. C; August 9, 2001 Transcript, p. 17 & 75.

Moreover, during the relevant time period, FUNB was divided for management purposes into a consumer banking side and an operations side. The consumer banking side consisted of the retail or branch banking

---

**16.** The other branch managers, in addition to Stone, are Challancin, Courtney, Crowley, J., Eaton, Fitzgerald, Good, Graybill, Hudson, MacDiarmid, Mallett, Partridge, Peltier, Robertson, and White, L. The Court notes that Defendant stated at oral argument there were thirteen branch managers, but that Defendants briefs identify fourteen such individuals.

functions and was divided into three geographic regions—Northern Florida, Central Florida, and Southern Florida. Huber Aff., ¶ 2. The staff or operations side, on the other hand, was divided by functional area, such as accounting, student loans, loan processing, collections, and statement rendering. Therefore, the consumer and operations areas of the bank had separate management structures and management personnel.[17] *Id.* The members of the class in this case represent a mixture of jobs in both divisions.

Both *Grayson* and *Hipp* are notable for their certification of a far more limited group of employee types. In *Grayson*, the named plaintiff and each member of the class were all store managers, and all worked within K Mart's Southern Region, and were thus subject to the same management structure. *Grayson*, 79 F.3d at 1090 & 1097–98. Similarly, in *Hipp*, all ten of the plaintiffs whose claims were eventually tried were district managers, and all were apparently employed within a single division of the company. *See Hipp*, 252 F.3d at 1219 & 1229. While other district court cases have certified ADEA classes consisting of individuals within a more varied job title and company-wide distribution range, none have certified a class as varied and diverse as the class before this Court. *See, e.g., Hyman v. First Union Corp.*, 982 F.Supp. 1, 4–5 (D.D.C.1997) (limiting action to exempt line employees with similar job responsibilities within a discrete geographical area (Virginia, Maryland, and the District of Columbia)); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 483 (E.D.N.Y. 2001) (certifying a class consisting of 126 employees, all of whom were engineers). Accordingly, the diversity in job titles among the members of the class in this case and

their distribution in both the consumer and operations sides of the bank, weighs in favor of decertification of the class.

The Court has considered separately the propriety of certifying a limited class consisting of only the fifteen individuals who, like Plaintiff Stone, were branch managers during the time that their employing institution was acquired by or merged with FUNB. Counsel were questioned on this possibility at oral argument, and Defendant's counsel conceded that these branch managers would be an appropriate ADEA class, were the Court to limit the class to those members. *See* August 9, 2001 Transcript, p. 85. However, Plaintiff filed a supplemental memorandum on August 24, 2001, that argues that it is impossible to determine that any group of plaintiffs is similarly situated based merely upon job title. The Court has considered Plaintiff's supplemental memorandum, and finds that it raises sufficient question as to whether the fifteen members of the class who were branch managers at the time their employing institution was acquired would constitute a proper ADEA class. Indeed, upon closer analysis, the Court finds that this more limited class would not be proper. To begin with, of the fourteen branch manager class members other than Stone, only three were part of the Southeast acquisition which formed the basis for Stone's complaint, and only five worked within FUNB's Southern Region. *See* Def.App. C. Like Stone, eight were hired as regular employees; four were hired as temporary employee, and one was not hired. The claims amongst the individual branch managers include involuntary reassignment with a pay cut, involuntary reassignment without a pay cut, failure to reassign or transfer after job elimination, failure

---

**17.** On the consumer banking side, each region was headed by a regional president who reported to FUNB's chairman and chief executive officer, Byron Hodnett. Within each region, several area presidents reported to the regional president. Consumer banking managers reported to each area president and managed a group of branches within a particular geographical area within the region, usually defined as a county. Branch managers reported to their respective consumer banking manager. Within each branch, there was an assistant branch manager or teller supervisor, or both, who reported to the branch manager. Huber Aff., ¶ 3.

On the operations side of the bank, there was a statewide manager for each of the several functional areas (accounting, student loans, etc.). Like the three regional presidents on the consumer side, each of these statewide managers reported directly to FUNB's chairman and chief executive officer, Byron Hodnett. Employees in these functional areas generally worked in service centers, although some worked out of branch locations. The statewide managers had managers within each service center who reported to them. Within the service center, each department generally had its own supervisor. Huber Aff., ¶ 4.

to promote, demotion, termination, inadequate training, being forced to post for alternative positions, and not being told about casual Friday. *Id.* This diversity, like the diversity for the entire group of class members, weighs against certification. Furthermore, as set forth below in section II(B)(2)(v), Plaintiffs have failed to put forth substantial evidence that any of the class members, including the subset of branch managers, were the victims of a company-wide pattern or practice of age discrimination. Accordingly, the Court finds it inappropriate to certify a more limited class consisting solely of class members who were branch managers.

### iii. Types of Actions

In *Hyman,* the district court found that, "the fact that the challenged employment practice, termination, is the same for each of the members ... [w]eigh[s] very strongly in favor of a collective action." *Hyman,* 982 F.Supp. 1, 4 (D.D.C.1997). Similarly, in *Hipp,* the Eleventh Circuit commented that, "[l]ike the plaintiffs in *Grayson,* ... Plaintiffs in this case ... all alleged similar, though not identical, discriminatory treatment." *Hipp,* 252 F.3d at 1219. All but one of the class members in *Hipp* complained that they were constructively discharged, while the other complained of discharge and harassment. In *Grayson,* all of the class members were demoted or terminated. *Grayson,* 79 F.3d at 1090.

In this case, the alleged personnel actions upon which the class members base their complaints are too diverse to support a collective action of "similarly situated" individuals. The adverse actions alleged by class members to constitute age discrimination include: (a) involuntary termination; (b) involuntary demotion without a pay cut; (b) involuntary demotion with a pay cut; (c) involuntary transfer and/or relocation; (d) failure to hire (at the time of acquisition); (e) failure to reassign or transfer after job elimination; (f) failure to promote; (g) failure to train; (h) constructive termination; (i) failure to pay allegedly owed bonuses or vacation pay; (j) failure to communicate personnel decisions privately; (k) harassment (hostile environment); (*l*) change in job title; and (m) failure to bring up to FUNB pay scale immediately. Plaintiff Stone, the representative Plaintiff upon whose claims the other class members seek to piggyback, does not allege involuntarily demotion without a pay cut, failure to hire at the time of acquisition, failure to promote, constructive termination, failure to pay bonuses or vacation pay, failure to communicate personnel decisions privately, hostile work environment harassment, or failure to bring up to the FUNB pay scale. Additionally, Stone is the only Plaintiff who asserts claims based on being forced to post for alternative positions and not being informed of FUNB's casual dress policy on Fridays.

The fact that the class members in this case have asserted myriad different claims and that many of those claims differ from the claims asserted by Plaintiff Stone leads to the conclusion that this factor weighs in favor of decertification.

### iv. Work Location

The Eleventh Circuit noted in *Hipp* that the fact that plaintiffs in that case worked in different geographical locations was not a conclusive factor. *Hipp,* 252 F.3d at 1219. Furthermore, in *Grayson,* the Circuit Court certified a class of plaintiffs who worked in several states, but within one company-designated region. *Grayson,* 79 F.3d at 1091. *See also Hyman,* 982 F.Supp. at 4 (finding that limiting the class to Virginia, Maryland, and the District of Columbia was a sufficient restriction).

In this case, the class is limited to a single state, Florida. Yet within that state, there are still significant geographical differences. Class members worked in approximately twenty-five cities throughout the state of Florida. Only twelve class members worked within the same county as Plaintiff Stone, and more than one-third worked outside the Southern Region. However, given the deemphasis on geographical factors in other cases and the findings in other cases that class members could be located in several states, this factor is neutral.

##### v. Pattern or Practice Evidence of Class–Wide Discrimination

■ Plaintiff Stone's collective action claim (Count I of the Complaint) alleges that Defendants have intentionally and willfully engaged in a pattern or practice of age discrimination in connection with their acquisition and consolidation of other banking institutions.[18] At this stage of the proceedings, the Court does not look at the merits of Plaintiff's claims. *See Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988) (holding that the district court, in making class certification decision, should avoid focusing on the merits of underlying class action). Plaintiff need only make "substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Grayson,* 79 F.3d at 1097. Nevertheless, despite extensive discovery, Plaintiff has not "put forth substantial evidence that the proposed class members were the victims of a single decision, policy, or plan infected by discrimination." *Brooks v. Bell-South Telecomms., Inc.,* 164 F.R.D. 561, 566 (N.D.Ala.1995).

■ In a pattern or practice case, plaintiffs must not only establish, by a preponderance of the evidence, that the employer discriminated against certain individuals, but also that "discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Hipp,* 252 F.3d at 1227 (*quoting Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). To meet this burden, plaintiffs must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." *Id.* The order and allocation of proof, as well as the overall nature of the trial proceedings, in a pattern or practice case differ from cases involving only individual claims of discrimina-tion. *Thiessen v. Gen. Elec. Capital Corp.,* 255 F.3d 1221, 1231 (10th Cir.2001); *Teamsters,* 431 U.S. at 357–62, 97 S.Ct. 1843, 52 L.Ed.2d 396. In the first stage, plaintiffs must establish that unlawful discrimination is the regular procedure or policy of the employer. When plaintiffs successfully establish a pattern and practice of employment discrimination, a rebuttable presumption that each plaintiff was a victim of discrimination obtains, and the burden shifts to the employer to prove that each individual employment decision was not made in furtherance of its illegal policy. *Hipp,* 252 F.3d at 1228. The employer may meet this burden with clear and convincing evidence that the job decisions made when the discriminatory policy was in force were not made in pursuit of that policy. *Id.* If the employer fails to rebut the inference that arises from the prima facie case, the finder of fact of fact can conclude that a violation occurred, and the trial court can award prospective equitable relief. *Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1843. If the plaintiffs also seek individual relief, the case moves into the second or subsequent stages, in which it is determined whether each individual plaintiff was a victim of the discriminatory practice. *Id.* Significantly, after prevailing in the first stage, the plaintiffs are entitled to a presumption in the second stage that the employer had discriminated against them. *Thiessen,* 255 F.3d at 1232.

■ Plaintiffs proceeding under a pattern and practice theory often introduce statistics to bolster their claim of discrimination. *Hipp,* 252 F.3d at 1228. While statistical evidence is often useful in pattern and practice cases, its absence is not fatal to the claims. *Id.* However, in the absence of such evidence, plaintiffs must do more than present vague allegations of a policy; there must be a concrete, standard procedure that the company uniformly enforced. *Id.*

---

**18.** Count I of Plaintiff Stone's Complaint also asserts an ADEA cause of action under the disparate impact theory, and Plaintiffs argued in their response to Defendant's motion to decertify that, "[w]hether First Union's policies, practices, and procedures had a disparate impact on acquired employees age forty and older" is a common question of law. However, the Eleventh Circuit recently held, in *Adams v. Florida Power Corp.,* 255 F.3d 1322, 1326 (11th Cir. July 5, 2001), that disparate impact claims may not be brought under the ADEA. On August 6, 2001, Defendant submitted a Motion for Summary Judgment With Regard to Plaintiffs' Claims Based on a Disparate Impact Theory [D.E. 929]. Based on *Adams,* Defendant's motion is granted, and Plaintiff's claims are dismissed to the extent that they are based on the disparate impact theory.

### a. Statistical Evidence

■ In this case, Plaintiffs have not submitted any statistics that bolster their allegations that age discrimination towards the employees of acquired institutions was the standard operating procedure of FUNB. In fact, during the relevant time period (1991 to 1994), the number of employees of FUNB over 40 years of age increased in absolute numbers from 2,278 to 4,313, and increased as a percentage of FUNB's workforce from 33% to 37%. *See* Huber Aff., ¶ 22. Plaintiff's counsel argues that these statistics carry little weight because they do not address what the average age of an FUNB employee would have been in the absence of discriminatory treatment. *See* August 9, 2001 Transcript, pp. 53–54. However, Plaintiffs have not presented any expert testimony to support these contentions, leaving the Court with the unavoidable conclusion that these raw employment numbers fail to show, and in fact are contrary to, any evidence of a pattern or practice of discrimination. *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977) (finding pattern or practice of discrimination where number of African–Americans and Spanish-surnamed persons hired for line-driver positions approached "the inexorable zero") (citation omitted); *Reynolds v. Roberts*, 202 F.3d 1303, 1319 n. 27 (11th Cir.2000) (suggesting that it would be difficult to establish that the employer was engaged in a pattern or practice of racial discrimination since "it is undisputed that the [employer] hired thousands of blacks" and promoted many of them to positions equal or superior to those to which their white counterparts were assigned).

Plaintiffs have attempted to argue that Defendant's "Displacement Status" reports, attached as Exhibit 22 to Plaintiff's Response, demonstrate statistical evidence of a significant disparity between the percentage of the acquired work force population over age forty, and the percentage of that workforce over age forty who were displaced. Additionally, Plaintiffs highlight the fact that no action was taken despite large differences (from 10% to 27%) in these numbers. *See* August 9, 2001 Transcript, p. 52; Plaintiff's Response, pp. 36–37. However, there are a number of problems with Plaintiffs' reliance on these statistics. First, the "Displacement Status" reports relate only to people displaced during mergers. Only 45 % of the class members were employed at institutions that were merged with FUNB and were subject to these reports. Second, the term "displaced" as used in these reports meant anyone not being retained in an ongoing position. Thus, the reports included people who voluntarily resigned, as well as people who were dedicated RTC employees, and thus for whom FUNB was merely the payroll agent, not the employer. Worley Depo., pp. 43, 44, 130, 138–41. Third, each report was only a snapshot of displacements as of a particular day shortly after the merger in question. They do not reflect whether subsequent actions took place that would have altered the statistics. Fourth, Plaintiffs are relying merely on counsel's interpretation of the statistics, and have not presented any expert testimony to support their assertions. Given these problems, Plaintiffs' reliance on the "Displacement Status" reports to prove a pattern or practice of discrimination is misplaced and carries little, if any, weight with the Court.[19]

### b. The Alleged Plan to Create a Younger Workforce

■ In *Grayson*, the Court surveyed the plaintiffs' submissions and found that they had presented evidence that relevant K Mart decisionmakers had specifically expressed discriminatory intent to purge the company of older managers. *Grayson*, 79 F.3d at 1097–1099. The evidence consisted of discriminatory comments by high-level decisionmakers, including the President, CEO, and Chairman of K Mart[20]; different treatment

---

19. Plaintiffs also allege in their Response that the average age of First Union employees has remained in the mid-thirties. Yet the only support provide for this statement is a cite to the deposition of Ed Crutchfield, former CEO of First Union, in which he stated that he did not know what the average age of a First Union employee is at the present time. Accordingly, the Court did not rely on this unsubstantiated allegation.

20. Joseph Antonini was quoted in *Grayson* as having acknowledged that he had undertaken a "program to renew" K Mart's image and as

of the performance evaluations of managers depending on age; inter-office memoranda and comments from high-level decisionmakers regarding a plan to build a paper trail that would be grounds for demotion of older managers; and anecdotal evidence supporting how that discriminatory plan was implemented. *Id.* Despite their attempts, Plaintiffs in this case have failed to produce any similar types of evidence, and have not presented evidence that would support a finding that First Union's practices evidenced a pattern or practice of age discrimination.

Plaintiffs rely heavily on Defendants' college recruiting program. It is undisputed that at all relevant times FUNB had a practice of recruiting on college campuses for graduates to enter a management training program. The training program was not limited to college recruits, although the majority of the recruits were in their late teens to early 20's. This management training program provided training for 20 to 30 people approximately twice per year, with the size of the class based upon the assessment of future openings by the Florida area presidents in consultation with consumer bank managers. Persons who completed the training were placed as branch managers, assistant branch managers, or consumer lenders, and, when the assistant branch manager position was eliminated in late 1993, as sales managers and service managers, all of which were salaried, exempt positions.

Plaintiffs' attempts to create evidence that the Defendants had a systematic plan to create a younger workforce out of the fact that they had this college recruiting program are unavailing. To begin with, there is no evidence that any college recruit took the specific position held by Plaintiff or any class member. More than half the 160 class members held non-exempt positions to which the college recruiting program did not apply. There is also no evidence that the Defendants increased their college recruiting efforts during the relevant time period. Plaintiffs also point to the fact that the college recruiting program targeted recruits who

would be "young bankers" with "fresh new ideas and outlook," who were "new talent," "in demand," and the company's "energetic" "future leaders." Pls. Ex. 18. These statements from Merry–Carol Dixon, the College Recruiting Manager, do not provide any proof that age discrimination was the standard operating procedure at First Union in its treatment of employees from acquired or merged institutions.

Plaintiffs also point to statements in a document entitled "Staffing at First Union," indicating that exceptional behaviors in terms of sales ability for employees acquired through mergers include being "aggressive," "hungry," and having an "extremely high energy level." Plaintiffs interpret these attributes as being stereotypically associated with younger workers, but provide no further support for such a position. Contrary to Plaintiffs' position, these terms are not uniquely used to describe young people. Moreover, these vague statements, and allegations of similar vague statements by the chief executive officer of First Union (*see* August 9, 2001 Transcript, pp. 58–60), do not compare to the definitive age-based comments set down by the Court in *Grayson.* *See Grayson,* 79 F.3d at 1097–98. The only specific age-based comment identified by the Plaintiffs in this case was made by Price Schwench, a regional president for First Union in Florida, shortly after the takeover of Southeast Bank, who allegedly told one of the class members that, "we could hire two people half your age at less than we're paying you." This lone statement by a lower-level manager targeted towards a specific individual does not evidence a corporate policy to replace older employees with younger employees.

**c.   Alleged Company–Wide Disregard of Problems**

Plaintiffs argue that Defendants ignored the problems brought to light by the *Hyman* case (*see Hyman v. First Union Corp.,* 982 F.Supp. 1 (D.D.C.1997)), thus evidencing a

---

having stated that he was proud of the management team because they "had a lot of experience and a lot of longevity left." *Grayson,* 79 F.3d at 1097–98. Furthermore, Antonini made public comments stating that "K Mart has one of the youngest and most aggressive marketing teams in retail" and extolling the young average age of K Mart managers. *Id.*

callous disregard for proven age discrimination problems. *See* Pls. Response, pp. 33–36. However, *Hyman* was filed in May 1994, just prior to the June 1994 end of the class action period in this case. The District of Columbia District Court issued an opinion regarding certification of the *Hyman* class on August 12, 1997, and the *Hyman* case settled in October 1997. Based on this sequence of events, it is illogical to argue that the events of the *Hyman* case could have had or should have had any discernible impact on Defendants' actions during the relevant time period in question (1991 to June 1994).

Plaintiff also argues that the Defendants took no steps to remedy ageism and sexism problems that were included in the "Mustelier Memo" that was distributed by Andrea Mustelier to First Union branch managers on June 22, 1992. *See* Pls. Ex. 26. The memo consists of 55 bullet points, only one of which relates to age, of topics to be discussed at a "brainstorming" meeting amongst First Union managers in Dade and Monroe counties. *See* Herrera Depo., p. 84. Upper management personnel were not part of the meeting, *id.* at 85, and there is no other evidence that promotions based on age were a problem at First Union. Far from being a "memo outlining problems that First Union was having with ageism," as Plaintiffs describe the Mustelier Memo (Pls. Response, p. 37), the memo has little if any probative value towards showing that Defendants had a pattern or practice of age discrimination.

■ Furthermore, Plaintiff argues that a correlation between age, salary, and length of service is evidence of the asserted company-wide disregard of age discrimination problems. Discrimination by Defendants that was based on salary or seniority considerations is not actionable under the ADEA. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 612, 113 S.Ct. 1701, 1707, 123 L.Ed.2d 338 (1993). Nevertheless, Plaintiff argues that managers were under pressure to eliminate older workers because they were given limited budgets to work within, and older workers generally have greater seniority and are paid more. However, Plaintiff has not produced any evidence that any of the class members were singled out for adverse action

because of any age-related budget pressure, and, in the absence of specific examples, general allegations that salary and age correlate or that one serves as a proxy for another are unconvincing. *See Hazen Paper,* 507 U.S. at 611, 113 S.Ct. at 1707 (noting that "age and years of service are analytically distinct").

## III. Conclusion

In October 1998, based on the allegations of the Complaint and a lenient application of the § 216(b) "similarly situated" standard, the Court preliminarily certified an opt-in class in this case consisting of all employees who are or were employed by First Union National Bank of Florida, were at least forty years of age while employed by FUNB, and were purportedly demoted, involuntarily discharged, not rehired, laid-off, or otherwise suffered adverse employment actions due to their age between February 4, 1992 through June 30, 1994. 160 individuals filed consents to opt-into this action. After extensive discovery, Defendants moved to decertify the class. Accordingly, the Court has endeavored to articulate and apply the more rigorous, heightened second-tier factual review endorsed by *Hipp* to determine if the class members are in fact similarly situated.

Based upon that analysis, decertification is appropriate. The class members have brought numerous different types of claims that relate to several different mergers and acquisitions involving different entities and institutions; were employed in different branches and divisions of First Union under several different job titles and classifications; and failed to show any evidence of a pattern or practice of age discrimination to which they were all subjected. When applied to the factors set forth by the Eleventh Circuit in *Hipp* and *Grayson,* the relevant facts weigh heavily in favor of decertification.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Decertify the Class [D.E. 699] is GRANTED. It is further

**ORDERED AND ADJUDGED** that Plaintiffs' Motion to Supplement Oral Argument

On Defendants' Motion to Decertify [D.E. 949] is GRANTED. It is further

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment With Regard to Plaintiffs' Claims Based on a Disparate Impact Theory [D.E. 929] is GRANTED.